# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MELVIN T. COOMER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00002 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Melvin T. Coomer, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Coomer protectively filed a prior SSI application on March 16, 1995, alleging disability as of September 21, 1993, based on a leg injury, a back injury, a collapsed lung and foot pain and numbness. (Record, ("R."), at 48-50, 60, 68.) This claim was ultimately denied by decision dated July 17, 1996. (R. at 354.) However, it was later remanded by this court for further consideration. (R. at 354.) The decision was thereafter affirmed by the ALJ by decision dated April 17, 2000. (R. at 354.) Although the Appeals Council affirmed this decision, it again was remanded by this court, at the request of the Commissioner, by order dated January 29, 2002.[2] (R. at 354-55.) Coomer protectively filed a second SSI application on February 13, 1997, again alleging disability as of September 21, 1993, based on a cyst or tumor behind the eye causing severe headaches and blurred vision, muscle spasms in the eye, anxiety and depression, leg pain, low back pain, asthma and breathing difficulty and post-traumatic stress disorder, ("PTSD"). (R. at 1366, 1394, 1417.)

---

[2]The Commissioner requested a remand in order to locate the claim file. (R. at 355.)

This claim was denied by decision dated January 20, 1999. (R. at 355.) The decision was appealed to the Appeals Council, but the order was lost and the file was combined with the court remand issued January 29, 2002, for a single hearing and decision. (R. at 355.) Coomer protectively filed a third SSI application on May 17, 2000, alleging disability as of September 21, 1993, based on back pain, leg pain, hip pain, headaches, depression and nervousness. (R. at 465-67, 475, 500.) This claim was denied by decision dated May 30, 2002. (R. at 355.) The decision was appealed to the Appeals Council and remanded by order dated December 18, 2003, for further consideration. (R. at 355.) Thereafter, Coomer filed a fourth SSI application, which was dismissed as a duplicate. (R. at 355.) The court remand dated January 29, 2002, and the Appeals Council remand dated December 18, 2003, were consolidated, and an ALJ held a hearing on June 29, 2005, at which Coomer was represented by counsel. (R. at 1977-2033.)

By decision dated July 20, 2005, the ALJ denied Coomer's claim. (R. at 354-63.) The ALJ found that Coomer had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 362.) The ALJ also found that the medical evidence established that Coomer suffered from severe impairments, namely substance abuse and a history of fractures to the left tibia and fibula. (R. at 362.) While the ALJ found that Coomer's substance abuse met 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09, the medical listing for substance addiction disorders, he found that, absent substance abuse, Coomer did not have an impairment or combination of impairments listed at, or medically equal to one listed at, 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 362.) The ALJ found that Coomer's allegations were not credible. (R. at 362.) The ALJ found that, absent substance abuse, Coomer had the

residual functional capacity to perform the full range of light work.[3]  (R. at 362.)  The ALJ found that Coomer did not have any past relevant work.  (R. at 362.)  Based on Coomer's age, education, work history and residual functional capacity, the ALJ found that the Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"), directed a finding that Coomer was not disabled absent substance abuse.  (R. at 362-63.)  Thus, the ALJ found that drug and alcohol abuse were contributing factors material to the finding of disability and that Coomer was not disabled under the Act and was not eligible for benefits. (R. at 363.)  *See* 20 C.F.R. § 416.920(f) (2007).

After the ALJ issued his decision, Coomer pursued his administrative appeals, but the Appeals Council denied his request for review.  (R. at 342-44.)  Coomer then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. § 416.1481 (2007).  The case is before this court on Coomer's motion for summary judgment filed June 14, 2007, and the Commissioner's motion for summary judgment filed August 16, 2007.

## II. Facts and Analysis

Coomer was born in 1970, (R. at 465), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c) (2007).  He has a seventh-grade education and no past relevant work experience.  (R. at 64.)

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2007).

-4-

At his most recent hearing, held on June 29, 2005, and at which Coomer was represented by counsel, Coomer testified that he had a problem with substance abuse. (R. at 1996.)  Specifically, he stated that he had smoked a lot of marijuana and taken LSD when he was an adolescent, but had not done so since the early 1990s.  (R. at 1996-97.)  Coomer further testified that he had experienced problems with alcohol, and that he had lost his driver's license in 1991 due to a driving under the influence, ("DUI"), conviction.  (R. at 1997.)  He stated that he had been charged with DUI most recently in 2003.  (R. at 1997.)  Coomer testified that from the late 1990s through 2003, he was not consuming a lot of alcohol. (R. at 1998.)  He stated that he had actually stopped drinking for a long period of time. (R. at 1998.)  Coomer stated that he went to prison in 2003 on another DUI charge after being declared an habitual offender.  (R. at 1998-99.)  However, Coomer stated that this incident in 2003 was an isolated incident.  (R. at 1999.)  He stated that he was not drinking or smoking marijuana on a daily basis from the mid-1990s through 2003.  (R. at 2000.)

Coomer testified that he had been involved in a serious automobile accident in 1993, resulting in a badly broken leg, lung problems, broken ribs  and a bruised heart. (R. at 2001.)  Coomer stated that he had hardware placed in his left leg as a result of the accident, resulting in difficulty walking and standing.  (R. at 2001-02.)  Coomer testified that he had been involved in an earlier automobile accident that resulted in a fractured vertebra in his mid  back.  (R. at 2001-02.)  He stated that he experienced pain on a daily basis, noting that the pain was so severe at times, that he self-medicated with alcohol.  (R. at 2002.)  He stated that he had been prescribed pain medication, to which he had become addicted.  (R. at 2002.)  Coomer testified that when his physicians would not give him pain medication, he self-medicated with

Case 2:07-cv-00002-PMS   Document 19   Filed 02/27/08   Page 5 of 33   Pageid#: 118

alcohol. (R. at 2003.) Coomer testified that he could walk from where he was sitting to the end of the parking lot.[4] (R. at 2003-04.) He stated that he had difficulty walking due to both pain and difficulty breathing, noting that he had experienced difficulty breathing since childhood. (R. at 2011-12.) However, he stated that it had worsened since the 1993 accident. (R. at 2011.) He stated that he felt as if his ankle and leg would give way, noting that he had fallen on multiple occasions resulting in a broken right hand.[5] (R. at 2004.) Coomer testified that he suffered from severe pain in his left leg daily, and that he experienced pain in his lower back and left hip. (R. at 2004-05.) He stated that his left leg was shorter than the right and that he had been given a shoe lift. (R. at 2005.) Coomer testified that he experienced headaches three or four times daily every two to three months. (R. at 2006.) He further stated that he could not properly grip objects with his right hand. (R. at 2006.) Coomer stated that he had difficulty pouring a glass of milk, stating that he had to use both hands. (R. at 2007.) He stated that he experienced numbness in his left hand and arm four or five times weekly. (R. at 2007.) Coomer testified that he had difficulty pushing and pulling objects. (R. at 2007-08.) He stated that he had difficulty bending, stooping and squatting. (R. at 2008.) Coomer testified that he went, at times, to Lee County Community Hospital, in hopes of obtaining pain medication. (R. at 2010-11.)

Coomer testified that he tried to avoid dealing with people. (R. at 2009.) He stated that he did not go to crowded places and he did not have a lot of friends with whom he socialized. (R. at 2009.) He stated that he became nervous around crowds and that he had a tendency to fight with people. (R. at 2009.) Coomer testified that

[4]There is no description in the record as to what such a distance was.

[5]Coomer testified that he was right-handed. (R. at 2004.)

-6-

he suffered from panic attacks, which resulted in shakiness, sweaty hands, paranoia and fear. (R. at 2011.) Coomer testified that he experienced lack of energy, but occasionally went for days at a time without sleeping. (R. at 2012.) He stated that he experienced nightmares regarding the 1993 accident. (R. at 2008-09.)

Margaret Robbins, Ph.D., a medical expert, also was present and testified at Coomer's hearing. (R. at 1981-95.) Based on the evidence of record, Robbins estimated Coomer's intelligence level as at least high borderline and, likely, low average. (R. at 1984.) Robbins summarized Coomer's myriad psychological complaints, treatment history, including hospitalizations for detoxification, and various diagnoses. (R. at 1984-89.) She also noted that the findings and diagnoses of the several mental health sources varied, and that there was evidence of polysubstance abuse and drug-seeking behavior. (R. at 1984-89.) Robbins also noted that Coomer's effort on testing varied. (R. at 1992-93.) Robbins was asked to consider a hypothetical individual with the limitations set forth in psychologist Stanley's assessment. (R. at 1990.) Robbins testified that such an individual would have a "very severe impairment." (R. at 1992.) Likewise, Robbins testified that an individual with the limitations set forth in psychologist Spangler's October 25, 2000, mental assessment would have a severe impairment. (R. at 1992.) Robbins testified that psychologist Latham's report, dated December 14, 1999, indicated an individual with a serious impairment. (R. at 1993.) Robbins stated that the records she had reviewed were mostly from the late 1980s and early 1990s, and that it was clear that Coomer had a substance abuse problem at that time. (R. at 1994.)

Dr. Susan N. Bland, M.D., another medical expert, also was present and

testified at Coomer's hearing. (R. at 2013-25.) Dr. Bland testified that the record was complicated regarding most of Coomer's ailments. (R. at 2015.) Despite numerous emergency room visits, largely due to his leg giving way resulting in falls, all physical examinations revealed relatively negative findings. (R. at 2017.) For instance, no weakness, reflex changes, sensory changes or range of motion changes had been noted. (R. at 2017.) With regard to Coomer's allegation of severe headaches, Dr. Bland noted that he had been involved in six automobile accidents and nine documented assaults with some sort of head or face trauma. (R. at 2017.) Coomer also underwent surgery on his sinuses in approximately 1997. (R. at 2017.) He complained of pain for a fair amount of time following the surgery, and he was prescribed narcotics. (R. at 2018.) Dr. Bland further noted that Coomer had experienced some hand trauma from fighting. (R. at 2018.) Specifically, Dr. Bland noted that he had fractured the fifth metacarpal on his right hand on two different occasions. (R. at 2018.) Dr. Bland stated that on several occasions, Coomer presented to the emergency room seeking pain medication, and when he was not given what he wanted, he walked out of the emergency room or became unhappy with what the physicians wanted to prescribe him. (R. at 2018.) On several of these occasions, Coomer was referred back to his own physician or to a specialist, but a lot of the time he never followed through. (R. at 2018.) Dr. Bland proceeded to testify that Coomer had experienced at least a couple of major things that would cause genuine amounts of pain that would most likely require a narcotic pain medication for a period of time. (R. at 2018-19.) She stated that it was possible that during those times, Coomer became addicted, further stating that it was impossible to determine whether his requests for pain medication were for true pain or because he was dependent on the medication. (R. at 2019.) Dr. Bland testified that the record was further complicated

-8-

by Coomer's noncompliance with a lot of treatment recommendations over the years, including psychiatric therapy appointments, ear, nose and throat appointments, recommendations that he undergo physical therapy, follow-up with his orthopedic surgeon and various testing recommended by emergency room physicians. (R. at 2019.) However, Dr. Bland testified that none of Coomer's physical impairments met or equaled a listing. (R. at 2019.)

Dr. Bland opined that, notwithstanding any drug-seeking behavior, Coomer would be limited from performing repetitive squatting, kneeling, crouching, crawling and stooping, walking on uneven surfaces, climbing ladders, working at unguarded heights, working around hazardous machinery and working around dust, fumes or irritants. (R. at 2020-21.) Dr. Bland opined that Coomer was not limited in his ability to sit, and she declined to impose a standing or walking limitation because she opined that further evaluation needed to be performed. (R. at 2021.) Dr. Bland further limited Coomer from repetitive strenuous gripping with the right hand. (R. at 2021.)

Norman Hankins, a vocational expert, also was present and testified at Coomer's hearing. (R. at 2025-31.) Hankins testified that Coomer had no past relevant work. (R. at 2026.) Hankins testified that an individual with the limitations set forth in psychologist Stanley's evaluation would not be able to work. (R. at 2027.) Hankins further testified that an individual with the limitations set forth in psychologist Spangler's October 25, 2000, evaluation would not be able to work. (R. at 2027-28.) Hankins was next asked to consider an individual with the physical limitations as testified to by Dr. Bland in conjunction with the psychological limitations set forth in the December 14, 1999, evaluation of psychologist Latham.

-9-

(R. at 2028.)  Again, Hankins testified that such an individual would not be able to work.[6]  (R. at 2028.)  Likewise, Hankins testified that an individual with the limitations set forth in Latham's November 2, 1998, evaluation would not be able to work.  (R. at 2028.)  Hankins testified that the limitations imposed by Dr. Bland would limit such an individual to light and sedentary jobs.[7]  (R. at 2029.)  Hankins was asked whether an individual with the limitations on standing, walking and use of his hands, as testified to by Coomer, would be able to work.  (R. at 2030.)  Hankins testified that such an individual would be limited to less than sedentary work.  (R. at 2030.)  Hankins was next asked whether an individual with a Global Assessment of Functioning, ("GAF"), score of 50 or below would be able to work.[8]  (R. at 2030.)  Hankins testified that a GAF score of 50 or below would be indicative of at least a moderately severe impairment, and that such an individual would not be able to work.  (R. at 2030-31.)

In rendering his decision, the ALJ reviewed medical records from Dr. Hossein Faiz, M.D.; Lee County Community Hospital; Dr. Mark W. Griffith, M.D.; Dr. Robert

---

[6]Hankins noted that, setting Dr. Bland's limitations aside, an individual with the limitations set forth in psychologist Latham's December 1999 evaluation would not be able to work.  (R. at 2028.)

[7]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items such as docket files, ledgers and small tools.  *See* 20 C.F.R. § 416.967(a) (2007.)

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..."  DSM-IV at 32.

Hayes, M.D.; Southwestern Virginia Mental Health Institute; Lee County Counseling Center; Dr. Richard Norton, M.D.; Dr. Patrick A. Molony, M.D.; Lee General Hospital; Dr. Braxton F. Cann Jr., M.D.; Holston Valley Hospital and Medical Center; Dr. S. Saha, M.D.; Bristol Regional Medical Center; Dr. Nabil Ahmad, M.D.; Rural Health Clinic; Edward E. Latham, Ed.D., a clinical psychologist; Dr. Ronald Durbin, M.D.; Dr. Atique Mirza, M.D.; Russell County Medical Center; Robert S. Spangler, Ed.D., a licensed psychologist; Charlton Stanley; Ph.D., a forensic and counseling psychologist; Pennington High School; Dr. Karl Konrad, Ph.D., M.D.; Frontier Health; Clearview Center; Dr. L.J. Fleenor, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Jai K. Varandani, M.D.; Dr. Ronald J. Horvath, M.D.; Dr. Abdul-Latief Almatari, M.D.; Virginia Department of Corrections; Regional Health Sources; Dr. R. Alan Davis, M.D.; Wellmont Holston Valley Medical Center; and Dr. Randall Pitone, M.D.

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is

unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Coomer argues that the ALJ erred in his residual functional capacity finding. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 11-18.) Coomer further argues that the ALJ erred by failing to find that he suffered from severe nonexertional impairments absent substance abuse. (Plaintiff's Brief at 18-24.) Coomer also argues that the ALJ erred by substituting his opinion for that of trained mental health professionals. (Plaintiff's Brief at 24.) Lastly, Coomer argues that the ALJ erred by failing to find that his impairments met or equaled the medical listing for anxiety-related disorders, found at § 12.06. (Plaintiff's Brief at 25-29.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether

-12-

the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Coomer argues that the ALJ erred by failing to find that he had severe nonexertional impairments absent substance abuse. (Plaintiff's Brief at 18-24.) For the following reasons, I disagree.

In 1996, Congress amended the Social Security Act to provide that "an individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. § 423(d)(2)(c) (West 2006). These amendments specified that they were to "apply to any individual who applies for, or whose claim is finally adjudicated by the Commissioner of Social Security ... on or after the date of the enactment of this Act." Pub. L. No. 104-21, § 105(a)(5)(A) (amending 42 U.S.C. § 405 notes, pertaining to

-13-

DIB), 110 Stat. 847, 853-54. Moreover, 20 C.F.R. § 416.935(a) states as follows: "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."

Thus, under the Commissioner's regulations, an ALJ must first conduct the five-step disability inquiry without considering the impact of alcoholism or drug addiction. If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits, and there would be no need to proceed with the analysis under 20 C.F.R. § 416.935. If the ALJ finds that the claimant is disabled and there is "medical evidence of [his or her] drug addiction or alcoholism," then the ALJ should proceed under § 416.935 to determine whether the claimant "would still [be found] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. § 416.935 (2007); *see Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001). In other words, if, and only if, an ALJ finds a claimant disabled under the five-step disability inquiry, should the ALJ evaluate whether the claimant still would be disabled if he or she stopped using drugs or alcohol. *See Bustamante*, 262 F.3d at 955.

Here, the ALJ found under the five-step disability inquiry that Coomer met the listing for substance addiction disorders, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09. (R. at 356, 362.) Thus, the ALJ found, under the five-step inquiry, that Coomer was disabled. However, the ALJ further found that, absent substance abuse, Coomer did not have an impairment or combination of impairments that met or equaled the criteria of any listed impairment. (R. at 356, 362.) For the

-14-

following reasons, I find that substantial evidence supports the ALJ's finding.

The record reveals that Coomer has suffered from several mental impairments for quite some time, including anxiety, depression, panic disorder, impulse control disorder, adjustment disorder with dependent and anxious mood, antisocial personality disorder, post-traumatic stress disorder, ("PTSD"), dysthymia, bipolar disorder and a learning disorder. (R. at 289, 298, 620-21, 653, 669-70, 875, 893, 896, 902, 908, 918, 921, 982, 995-1000, 1002, 1013, 1029-38, 1043-57, 1061, 1085, 1505-13, 1577-78, 1647, 1652, 1674, 1681, 1712, 1724, 1728, 1731, 1737, 1746, 1755, 1845, 1862, 1865.) However, it also is clear that Coomer has suffered from substance abuse, including alcohol abuse and abuse of various drugs, including marijuana, Oxycontin, LSD and other prescription narcotics. While Coomer has stated at various times that he has not been drinking or using drugs, the record before the court reveals otherwise. For instance, on April 29, 1996, during his initial intake at Lee County Counseling Center, ("LCCC"), Coomer denied alcohol or drug use since 1991 or 1992. (R. at 255, 1591.) However, the record shows that on October 20, 1993, Coomer admitted to consuming alcohol. (R. at 125, 1609.) On September 30, 1995, the record shows that Coomer was experiencing delirium tremens. (R. at 154, 724, 1625.) Finally, on January 9, 1996, a nurse practitioner for Dr. Richard Norton, M.D., noted that Coomer smelled of alcohol. (R. at 252, 868, 1428.) Coomer denied the use of alcohol on December 19, 1996, to Dr. Patrick A. Molony, M.D., but on March 10, 1997, it was noted that Coomer smelled of alcohol. (R. at 681, 950, 1431, 1476.) On March 13, 1997, Dr. R. Alan Davis, M.D., expressed a concern that Coomer might be addicted to pain medication, and Coomer admitted that he probably was. (R. at 938, 1479.) On June 23, 1997, Coomer even denied having any history of alcohol abuse. (R. at 971,

-15-

1538, 1708.)  On December 8, 1997, Dr. Molony opined that Coomer was seeking drugs.  (R. at 296.)  Again, on May 7, 1998, Coomer smelled of alcohol.  (R. at 636, 1553.)  On July 6, 1998, in contradiction to the evidence before the court, Coomer informed Edward E. Latham, Ph.D., a clinical psychologist, that he had not consumed alcohol since 1993.  (R. at 978, 1643.)  On August 16, 1999, Coomer reported occasional alcohol use.  (R. at 595.)  Nonetheless, on September 4, 1998, Coomer denied alcohol or drug use.  (R. at 994, 1651.)  However, later that same month, on September 21, 1998, Coomer admitted that he had been drinking.  (R. at 626.)  On October 4, 1999, he denied alcohol and drug use.  (R. at 586, 902, 1731.)  The following day, he denied consuming alcohol for the previous two months.  (R. at 1001, 1673.)  Later that same month, Coomer denied alcohol use for the previous four or five months.  (R. at 892, 1721.)  On October 22, 1999, Coomer informed Dr. Randall Pitone, M.D., that he had not consumed alcohol since June of that year, stating that he drank only on New Year's, which also was his birthday, and Memorial Day.  (R. at 891, 1720.)  At his hearing in June 2005, Coomer admitted that he had been charged with DUI in 2003.  (R. at 1998.)

Thus, given all of this evidence, it is clear to the court that Coomer has suffered from alcohol abuse in the past.  However, it is equally clear to the court that any periods of sobriety that Coomer might have experienced cannot be delineated from the record currently before it.  In fact, it appears that Coomer's alcohol abuse is so intertwined with his mental impairments that they simply cannot be separated.

In addition to this evidence of alcohol abuse, the record contains several references regarding Coomer's drug use.  From the time Coomer underwent a closed

-16-

reduction on his leg following a serious automobile accident in September 1993, until at least through 2004, the record shows that he sought various pain medications from several different sources on a rather consistent basis. The record further shows that when Coomer was prescribed nonnarcotic medications by emergency room physicians, he became angry and left without the medication on more than one occasion. Likewise, on more than one occasion, Coomer stated that he would just "go to Kingsport." (R. at 560, 590.) Apparently, this is a reference to Dr. Mark W. Griffith, M.D., an orthopedist, who had prescribed him narcotics following the closed reduction. Coomer himself admitted to psychologist Latham that he had become addicted to painkillers following the automobile accident. (R. at 1010, 1678.) On October 20, 1997, Dr. Molony noted that he was prepared to prescribe Coomer Lortab, but learned that Coomer already was receiving Lortab from Dr. Nabil Ahmad, M.D. (R. at 297, 944, 1469, 1542.) On December 8, 1997, Dr. Molony opined that Coomer was seeking drugs. (R. at 296.) Later that month, a mental health caseworker also opined that Coomer was drug-seeking. (R. at 301, 668, 1580.) On March 24, 1999, Coomer underwent a drug screen that was positive for cannabinoid. (R. at 776-78.) On May 12, 1999, Coomer admitted to smoking marijuana once every week or two to "calm his nerves." (R. at 917, 1745.) On June 15, 1999, Coomer presented to the emergency department at Lee County Community Hospital, ("LCCH"), with complaints of a rib injury after falling two days previously. (R. at 609.) He requested something strong for pain. (R. at 610.) The emergency room physician noted that Coomer walked slowly and bent over. (R. at 610.) When Coomer was informed that he would not be written a new prescription, he left the emergency department walking briskly and upright, addressing obscene epithets to the staff. (R. at 610.) He was diagnosed with drug-seeking behavior. (R. at 611.) On June 17, 1999, Coomer

reported using marijuana once weekly to relax his back. (R. at 907, 1736.) On October 5, 1999, Coomer stated that he had not used marijuana for the previous two months. (R. at 895, 1723.) On October 20, 1999, Coomer reported that he had not used marijuana for the previous four weeks, stating that he would not have to self-medicate if he had medication for his nerves. (R. at 892, 1721.) A counselor at LCCC opined that he was drug-seeking. (R. at 892, 1721.) On October 25, 1999, Coomer's individualized service plan, ("ISP"), was reviewed at LCCC. (R. at 890.) It was noted that his primary diagnosis was substance abuse and polysubstance dependence and his secondary diagnosis was substance-induced mood disorder. (R. at 890, 1719.) On November 10, 1999, Coomer presented to the emergency department at LCCH with complaints of head and arm pain after being assaulted. (R. at 549, 1816.) X-rays revealed a mild nondisplaced nasal bone fracture. (R. at 567-68, 1826.) After refusing Anaprox, Coomer was prescribed Lortab. (R. at 553, 1819.) Coomer returned later that day, stating that he could not remember whether he had the prescription from the earlier visit filled. (R. at 557, 1820.) However, the treatment notes reveal that Coomer later informed the physician that he already had taken all of the Lortab from his visit earlier that day and that he needed something stronger. (R. at 558.) On January 26, 2000, Coomer's ISP again reflected diagnoses of polysubstance dependence, in partial remission, by report, and substance-induced mood disorder. (R. at 883.)

On August 16, 2000, Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating, among other things, that Coomer's anxiety was related to his substance abuse. (R. at 1034.) Likewise, on October 3, 2000, Howard S. Leizer, Ph.D., another state agency

-18-

psychologist, completed a mental residual functional capacity assessment, indicating that Coomer's anxiety was related to substance abuse. (R. at 1048.) On May 10, 2001, Coomer presented to the emergency department at LCCH after being involved in a motor vehicle accident. (R. at 1106, 1782.) When Coomer learned that he had been written prescriptions for Anaprox and Flexeril, he became angry and walked out, refusing to accept the prescriptions. (R. at 1107, 1781.) On December 3, 2002, Coomer informed B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, that he had not used drugs in the previous five years. (R. at 1235.) On April 29, 2003, Coomer complained to Dr. Molony of his drug abuse. (R. at 1182.) Coomer admitted to using Oxycontin intravenously and stated that he wanted help. (R. at 1186.) A drug screen was positive for opiates, benzodiazepines and cannabinoid. (R. at 1186.) Coomer was admitted to Clearview for inpatient detoxification. (R. at 1149, 1158.) Upon admission to Clearview, Coomer's GAF was 20-35.[9] (R. at 1152.) However, after detoxification, on May 27, 2003, he was diagnosed with opiate dependence, a substance-induced mood disorder and a then-current GAF score of 55.[10] (R. at 1143.) On September 17, 2003, Dr. Abdul-Latief Almatari, M.D., noted needle track marks on both of Coomer's forearms. (R. at 1865.)

---

[9]A GAF score of 11 to 20 indicates that the individual shows "[s]ome danger of hurting self or others ... OR persistent inability to maintain minimal personal hygiene ... OR gross impairment in communication ...." DSM-IV at 32. A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment ... OR inability to function in almost all areas...." DSM-IV at 32. A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ...." DSM-IV at 32.

[10]A GAF of 51 to 60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

-19-

Thus, just as with his alcohol abuse, the record is clear that Coomer suffers from drug abuse as well.  This drug abuse is so intertwined with his alleged mental impairments that it simply cannot be separated therefrom.  A clear indicator that Coomer's drug and/or alcohol abuse is a material factor contributing to his disability is that, after receiving inpatient substance abuse treatment on more than one occasion, Coomer's GAF scores have consistently dramatically increased.  Lending further support to the ALJ's finding that Coomer's substance abuse is a material factor contributing to his disability are the findings of multiple mental health sources that his mental impairments are substance-induced.

For all of these reasons, I find that substantial evidence supports the ALJ's findings that Coomer did not suffer from a severe nonexertional impairment other than substance abuse. I further find that this evidence supports the ALJ's finding that Coomer's alcohol and drug use were contributing factors material to his determination that Coomer was disabled and that, absent Coomer's substance abuse, he would not be disabled.  That being the case, I find that substantial evidence supports the ALJ's finding that Coomer is not entitled to SSI benefits due to his alleged mental impairments.

Coomer also argues that the ALJ erred by substituting his own opinion for that of trained mental health professionals.  (Plaintiff's Brief at 24.)  Again, I disagree.  It is well-settled that "[i]n the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of plaintiff's psychiatric problems for that of a trained professional." *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W.Va. 1985) (citing

*McLain*, 715 F.2d at 869; *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Here, the ALJ found that, absent Coomer's substance abuse, Coomer would not be disabled. As already discussed, there is evidence contained in the record to support this finding. For instance, in October 1999, Coomer was diagnosed with substance-induced mood disorder. (R. at 890, 1719.) Again, in January 2000, he received the same diagnosis. (R. at 883.) Likewise, in August 2000, state agency psychologist Tenison opined that Coomer's anxiety was related to his substance abuse, and in October 2000, state agency psychologist Leizer found the same. (R. at 1034, 1048.) Finally, in May 2003, Coomer was diagnosed with a substance-induced mood disorder. (R. at 1143.) These specific diagnoses, coupled with Coomer's long-term history of substance abuse, and as previously discussed, his improvement with inpatient treatment, provide substantial evidence for the ALJ's finding. In other words, I find that the ALJ's finding is not "[i]n the absence of any psychiatric or psychological evidence to support his position. ..." *Grimmett*, 607 F. Supp. at 503 (citing *McLain*, 715 F.2d at 869; *Oppenheim*, 495 F.2d at 397).

Coomer further argues that the ALJ erred by failing to find that his condition met or equaled the criteria of the listing for anxiety-related disorders found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06. (Plaintiff's Brief at 25-29.) I will not address this argument at length given the previous finding that substantial evidence supports the ALJ's finding that Coomer's substance abuse is a material factor contributing to the finding of disability.

I next will address Coomer's argument that the ALJ erred in his physical residual functional capacity finding. (Plaintiff's Brief at 11-18.) The ALJ found that

Coomer could perform the full range of light work. For the following reasons, I find that substantial evidence supports this finding.

Coomer complained of disability based on a leg injury, a back injury, a collapsed lung and foot pain and numbness. Coomer was involved in a motor vehicle accident on September 21, 1993, resulting in multiple left rib fractures, a traumatic pneumothorax and a comminuted displaced fracture of the left tibia and fibula. (R. at 94-110, 810-27, 1613.) He underwent a closed reduction to repair these fractures. (R. at 99-110, 813-15, 1614-15.) He was discharged by Dr. Hossein Faiz, M.D., on October 1, 1993, on Keflex and Darvocet. (R. at 812, 1612.) Coomer saw Dr. Griffith, an orthopedist, from October 11, 1993, to December 22, 1994. (R. at 111-19.) On October 11, 1993, Dr. Griffith noted that Coomer's leg was shortened by 1.5 to 2 centimeters. (R. at 118, 835, 1601.) Upon Dr. Griffith's recommendation, Coomer's tibial fracture was rodded on October 20, 1993. (R. at 121-27, 837-42, 1607-08.) Subsequent to the rodding procedure, Coomer did well, continuing to partially weight-bear. (R. at 111.) On October 22, 1993, Coomer consulted with Amy Lambert, a physical therapist, who noted decreased ambulatory skills, but excellent potential. (R. at 128.) On November 2, 1993, and again on November 29, 1993, x-rays showed satisfactory alignment. (R. at 1599-1600.) On December 28, 1993, x-rays again showed satisfactory alignment, and Dr. Griffith noted that Coomer had been toetouch weightbearing with crutches. (R. at 1599.) By March 29, 1994, Coomer was advised to increase his activities. (R. at 114, 831, 1597.) On July 8, 1994, x-rays showed satisfactory consolidation of the fractures, with no change in the rod position. (R. at 1595.) On December 9, 1994, the rods were removed from Coomer's leg without complication. (R. at 140-41, 858-59, 1605-06.) By December

-22-

22, 1994, Dr. Griffith noted that Coomer was doing well, and he advised him to continue increasing his activities. (R. at 111, 828, 1073.)

On November 12, 1995, Coomer complained of back pain radiating into the outer part of the left thigh. (R. at 247, 722, 1623.) He had full strength in the lower extremities, asymmetrical reflexes and decreased sensation on the lateral aspect of the left thigh. (R. at 247, 722, 1623.) He was diagnosed with lumbosacral strain. (R. at 247, 722, 1623.) On December 13, 1995, Coomer complained of left ankle pain. (R. at 245, 720, 1621.) However, his ankle was stable with a full range of motion and only mild tenderness. (R. at 245, 720, 1621.) He was diagnosed with left ankle pain. (R. at 245, 720, 1621.) A physical examination performed by Dr. Norton on January 9, 1996, revealed a full range of motion of the left hip without crepitus, deep tendon reflexes of 2+ and good muscle tone of the knee and ankle. (R. at 252, 1428.) Coomer was diagnosed with left hip pain. (R. at 252, 1428.) On January 19, 1996, Coomer had a full range of motion and equal deep tendon reflexes. (R. at 1461.) His sensation and motor strength were equal, and his ability to heel and toe walk was intact. (R. at 1461.) On February 19, 1996, Dr. Molony noted tenderness of Coomer's lower back. (R. at 1476.) On December 15, 1996, Coomer complained of low backache radiating into the legs. (R. at 691, 693, 1440.) However, he exhibited no tenderness in the flank and had full strength in the lower extremities. (R. at 693, 1442.) On December 19, 1996, Coomer exhibited tenderness in the lower back. (R. at 950.)

On May 12, 1997, Coomer complained of back pain of the lumbar spine. (R. at 947, 1473.) Although a physical examination revealed tenderness on palpation and

-23-

reduced range of motion, x-rays yielded normal results. (R. at 767, 947, 1473, 1536.) On June 23, 1997, Coomer saw Dr. Ahmad with complaints of severe pain in the left hip with some radiation into the left leg and knee. (R. 970, 1537, 1707.) A physical examination revealed no scoliosis, and Coomer's range of motion and flexion were full with pain in the left hip. (R. at 971, 1538, 1708.) Range of motion on extension was full, and on lateral bending to the right and left there was pain in the left hip. (R. at 971, 1538, 1708.) Straight leg raising was negative bilaterally. (R. at 971, 1538, 1708.) Dr. Ahmad noted a .5 centimeter leg length discrepancy, with the left leg being shorter. (R. at 971, 1538, 1708.) Coomer's motor strength was full, his sensory examination showed decreased pinprick sensation in the L3, L4 and L5 dermatomes on the left side and deep tendon reflexes were symmetrically brisk with antalgic gait. (R. at 971, 1538, 1708.) Dr. Ahmad noted severe tenderness in the left sacroiliac and piriformis area. (R. at 971, 1538, 1708.) Pain symptoms also were noted in the quadratus lumborum and paraspinal muscles on palpation. (R. at 971, 1538, 1708.) Dr. Ahmad diagnosed left sacroiliitis, left piriformis syndrome, leg length discrepancy with pelvic rotation, left leg being shorter by .5 centimeters and myofascial pain syndrome. (R. at 972, 1539, 1709.) Coomer was prescribed medications and was given a shoe insert. (R. at 972, 1539, 1709.)

On June 30, 1997, a physical examination revealed decreased range of motion of the left hip and tenderness over the piriformis muscle and sacroiliac joints. (R. at 969, 1533, 1710.) Dr. Ahmad administered a Celestone injection, which resulted in improved range of motion. (R. at 969, 1533, 1710.) On July 7, 1997, a physical examination revealed that Coomer's sensation was within normal limits, but his spinal range of motion was limited in all planes. (R. at 946, 1472.) Coomer's left hip range

-24-

of motion was limited with pain initiated on slightest movement. (R. at 946, 1472.) Dr. Molony diagnosed acute exacerbation of chronic back pain and left hip pain. (R. at 946, 1572.) On July 21, 1997, Coomer reported improvement in symptoms following the Celestone injection. (R. at 967, 1531, 1705.) Despite Dr. Ahmad's recommendation to begin physical therapy, Coomer had not done so. (R. at 967, 1531, 1705.) Physical examination revealed full muscle strength, symmetrical deep tendon reflexes and negative straight leg raising. (R. at 967, 1531, 1705.) However, decreased range of motion was noted. (R. at 967, 1531, 1705.) Another prescription for physical therapy was dispensed, and Coomer was advised to maintain a home exercise program. (R. at 967-68, 1531, 1705.) On August 18, 1997, Dr. Ahmad noted that Coomer's hip pain had improved. (R. at 965, 1529, 1703.) Coomer reported an inability to afford the physical therapy as prescribed. (R. at 965, 1529, 1703.) Straight leg raise testing was negative at that time. (R. at 965, 1529, 1703.) On August 23, 1997, a physical examination revealed tenderness in the mid thoracic area. (R. at 1499.) Coomer's low back was nontender, and sensation was intact to light touch and pinprick in both lower extremities. (R. at 1499.) Coomer's deep tendon reflexes were 2+ and bilaterally symmetric, and his gait was normal with normal motor strength. (R. at 1499.)

On September 29, 1997, Dr. Ahmad noted that Coomer's symptoms were much improved and that he was working in construction. (R. at 963, 1527, 1701.) Straight leg raise testing was negative for radiculopathy, and although Coomer had mild tenderness of the sacroiliac joints, they were very stable. (R. at 963, 1527, 1701.) Coomer's motor strength was full, his sensory examination was intact and his deep tendon reflexes were symmetrical. (R. at 963, 1527, 1701.) On October 22, 1997,

-25-

Coomer reported a flare-up of thoracic pain with feelings of numbness and severe pain in the left shoulder, left arm, left hip and left leg. (R. at 961, 1525, 1699.) Coomer stated that he had stopped working the previous week. (R. at 961, 1525, 1699.) Coomer had full muscle strength, but a sensory examination showed some decrease in pinprick sensation in the T1 dermatome in the left upper extremity. (R. at 961, 1525, 1699.) Deep tendon reflexes were symmetric. (R. at 961, 1525, 1699.) On November 3, 1997, straight leg raising was negative for radiculopathy. (R. at 960, 1524, 1698.) There was no evidence of swelling of the thoracic spine or any other sensory or neurologic findings. (R. at 960, 1524, 1698.) Dr. Ahmad noted that Coomer was doing better with a home exercise program. (R. at 960, 1524, 1698.)

On November 21, 1997, Dr. Abe M. Jacobson, M.D., a state agency physician, completed a physical assessment, finding that Coomer could perform medium work.[11] (R. at 1513-21.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 1516-18.) On January 7, 1998, Dr. Ahmad described Coomer's low back pain as relatively stable. (R. at 959, 1522, 1697.) Later that month, on January 26, 1998, Coomer's gait was within normal limits, and his neurological examination was unchanged. (R. at 958, 1523, 1696.) Dr. Ahmad discharged Coomer from his care with instructions to follow up with a primary care physician. (R. at 958, 1523, 1696.) On March 4, 1998, Coomer complained of neck and back pain after being involved in a motor vehicle accident. (R. at 266, 639, 642.) X-rays of the cervical spine were normal. (R. at 268, 641, 1558, 1667-68.) The same day, Dr. Norton performed a physical examination showing that Coomer had a good

---

[11]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2007).

-26-

range of motion of the neck with some cracking, popping and pain. (R. at 270, 866, 974, 1545-46, 1669-70.) Upper extremity strength was good, range of motion of the back was at least 90 degrees on right and left rotation, straight leg raise testing was negative and deep tendon reflexes and sensation were equal. (R. at 270, 866, 974, 1545-46, 1669-70.) On March 13, 1998, Coomer stated that his neck and back were "okay." (R. at 272, 865, 1547-48, 1666.) On May 11, 1998, Coomer exhibited tenderness to palpation at the T5-T6 level of the spine with spasm. (R. at 274, 974, 1549, 1665.) However, his deep tendon reflexes were 2+, and straight leg raise testing was negative. (R. at 274, 974, 1549, 1665.) Coomer received a Celestone injection. (R. at 975-76, 1544, 1665.)

On July 25, 1998, Coomer saw Dr. Ronald S. Durbin, M.D., an orthopedic surgeon, for an evaluation. (R. at 986-87, 1636-37.) Dr. Durbin noted Coomer's leg length discrepancy, but he noted no evidence of discogenic back pain and no evidence of loss of motion of the left hip. (R. at 986, 1636.) He advised Coomer to get a shoe lift to diminish the left lower extremity pain. (R. at 987, 1637.) Dr. Durbin also completed a physical assessment, finding that Coomer could lift items weighing up to 25 pounds occasionally, but could not lift any amount of weight on a frequent basis. (R. at 988-90, 1638-40.) He found that Coomer could stand and/or walk for 30 minutes without interruption. (R. at 988, 1638.) He concluded that Coomer's ability to sit was not affected by his impairment. (R. at 989, 1639.) Dr. Durbin also found that Coomer could never climb, stoop, kneel, crouch or crawl, but could occasionally balance. (R. at 989, 1639.) On September 4, 1998, Dr. Atique Mirza, M.D., noted no pedal edema and full strength. (R. at 995, 1652.) She further noted normal muscle tone and normal range of motion at the joints with a very slight decrease at the

-27-

cervical spine on side-to-side movements. (R. at 995, 1652.) On January 24, 2000, Coomer saw Dr. Nabil Ahmad, M.D., with complaints of neck and left knee pain. (R. at 956, 1694-95.) Spurling's sign[12] was negative bilaterally, as was straight leg raise testing. (R. at 956, 1694.) Coomer had full strength in the upper and lower extremities, and his sensory examination was normal. (R. at 956, 1694.) Deep tendon reflexes were symmetric, and Coomer exhibited no pain with range of motion of the left knee joint. (R. at 956, 1694.) McMurray's sign[13] was negative, as was anterior and posterior Drawer test.[14] (R. at 956, 1694.) Coomer exhibited no pain on rotation of the patella. (R. at 956, 1694.) Dr. Ahmad noted the possibility of physical therapy or trigger point injections in the future. (R. at 956, 1694.)

On August 16, 2000, Dr. Donald R. Williams, M.D., a state agency physician, completed a physical residual functional capacity assessment, finding that Coomer could perform light work. (R. at 1021-28.) Dr. Williams imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 1023-25.) Dr. Williams noted that Coomer did not return his activities of daily living questionnaire and that Coomer's subjective allegations were not credible. (R. at 1026.) This assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on October 3, 2000. (R. at 1028.)

---

[12]Spurling's sign is the creation of upper extremity pain by extending the neck and rotating the chin toward the affected extremity. *See* http://www.medscape.com/viewarticle/408540-4.

[13]McMurray's sign is the occurrence of a cartilage click during manipulation of the knee. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1524 (27th ed. 1988).

[14]Drawer test is an indication of laxity or a tear in the anterior cruciate ligaments of the knee in which there is a forward or backward sliding of the tibia. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 243 (1995).

-28-

On November 1, 2001, although Coomer complained of pain in the upper back, he had full strength in all extremities. (R. at 1776-77.) On February 27, 2002, Coomer saw Dr. Karl W. Konrad, Ph.D., M.D., for an evaluation of his back pain. (R. at 1135-37.) Coomer exhibited full range of motion in all joints with no tenderness, heat, swelling or deformity. (R. at 1135.) His neck also had full range of motion. (R. at 1135.) Coomer's back had no kyphosis, and he had normal lumbar flexure, no tenderness, no muscle spasm, full range of motion and negative straight leg raising. (R. at 1136.) Dr. Konrad noted that Coomer was able to rise from the chair and get onto and off of the exam table without difficulty. (R. at 1136.) He had a full grip and normal dexterity. (R. at 1136.) Coomer walked unassisted without a limp, and he was able to tandem walk. (R. at 1136.) He exhibited full strength in the upper and lower extremities. (R. at 1136.) He had no asymmetrical muscle wasting and was able to bear weight on each leg separately and walk on toes and heels. (R. at 1136.) Coomer's reflexes were normal and symmetrical. (R. at 1136.) He had intact sensation to pinprick, vibration and light touch. (R. at 1136.) X-rays of Coomer's lumbar spine and hips yielded normal results. (R. at 1137.) Dr. Konrad concluded that Coomer's physical exam was unremarkable and that he had no impairment-related physical limitations. (R. at 1137.)

Dr. Konrad also completed a physical assessment, finding that Coomer was not limited in his abilities to lift/carry, to stand/walk, to sit, to reach, to handle, to feel, to push/pull, to see, to hear or to speak. (R. at 1138-40.) He found that Coomer could occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 1139.) Dr. Konrad imposed no environmental restrictions. (R. at 1140.)

Case 2:07-cv-00002-PMS   Document 19   Filed 02/27/08   Page 29 of 33   Pageid#: 142

On December 5, 2002, Coomer saw Dr. Jai Varandani, M.D. (R. at 1254-59.) Coomer stated that he could walk unassisted for quite a distance, and he was able to sit without any discomfort. (R. at 1256.) Coomer reported an ability to lift objects weighing up to 15 pounds with no difficulty reaching. (R. at 1256.) Power tone and deep tendon reflexes in the upper and lower extremities were normal bilaterally. (R. at 1256.) Sensation to touch was normal, and all peripheral pulsations were intact and palpable. (R. at 1256.) Dr. Varandani noted no signs of central or peripheral cyanosis. (R. at 1256.) No ankle or patellar clonus was noted. (R. at 1256.) Dr. Varandani noted mild thoracic and lumbar spine tenderness, but no particular point tenderness. (R. at 1256.) No restricted range of motion was noted. (R. at 1256.) Movements at the left ankle were unrestricted, and Coomer had good strength in both flexion and dorsal flexion. (R. at 1256-57.) X-rays of the lumbar spine showed mild scoliosis and mild straightening of the curvature, but no acute compression or any other significant abnormality. (R. at 1260.) Coomer's disc spaces were within normal range. (R. at 1260.) Dr. Varandani diagnosed Coomer with chronic mild lumbar pain and possible degenerative joint disease of the spine. (R. at 1257.)

On February 28, 2003, Dr. Randall Hays, M.D., a state agency physician, completed a physical assessment, finding that Coomer could perform medium work. (R. at 1261-69.) He imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 1264-66.) Dr. Hays found Coomer's allegations only partially credible. (R. at 1267.) This assessment was affirmed by Dr. Gary Parrish, M.D., another state agency physician, on June 2, 2003. (R. at 1268.) On March 20, 2003, Dr. Ronald J. Horvath, M.D., completed a review of Dr. Hays's assessment, agreeing with all of his findings. (R. at 1270.)

-30-

On June 11, 2003, Coomer saw Dr. L.J. Fleenor, M.D., with complaints of low back pain.  (R. at 1232.)  X-rays of the lumbar spine showed a questionable mild compression of the L2 vertebral body.  (R. at 1233.)  He was diagnosed with low back syndrome and was prescribed Robaxin and Anabar.  (R. at 1232.)  On June 16, 2003, x-rays revealed no acute compression.  (R. at 1309.)  On September 17, 2003, a physical examination revealed mild paraspinous tenderness.  (R. at 1865.)  Virginia Department of Corrections records show that Coomer complained of low back pain radiating into his legs on July 27, 2004.[15]  He was referred to a physician.  (R. at 1285.)  On October 6, 2004, while still incarcerated, Coomer again complained of low back pain.  (R. at 1285.)  A physical examination revealed no tenderness on palpation and negative straight leg raising.  (R. at 1285.)  He had a good range of motion at the waist in all directions, and deep tendon reflexes were within normal limits.  (R. at 1285.)  On November 10, 2004, despite Coomer's complaints of low back pain, no pain was exhibited on palpation of the spine, and he had negative straight leg raising.  (R. at 1284.)  Coomer had a good range of motion at the waist in all directions, and deep tendon reflexes were within normal limits.  (R. at 1284.)

On May 27, 2005, Coomer presented to the emergency department at Lee Regional Medical Center with complaints of low back pain.  (R. at 1295.)  However, it was noted that Coomer could ambulate independently and could perform all activities of daily living without assistance.  (R. at 1295.)

The record before the court evidences that Coomer's musculoskeletal

---

[15]Coomer was incarcerated for a driving under the influence conviction after being classified as an habitual offender.

-31-

impairments resulted in no more than minimal limitations on his physical abilities. I note that while physical examinations have revealed largely unremarkable findings, Coomer has exhibited back tenderness, some range of motion difficulties and some decreased sensation. Dr. Durbin found that Coomer could never climb, stoop, kneel, crouch or crawl, but could occasionally balance. (R. at 989, 1639.) Nonetheless, the majority of medical sources contained in the record opined that Coomer could perform at least light work. Although Dr. Durbin, in July 1998, opined that Coomer could not lift any amount of weight on a frequent basis, that he could stand and/or walk for only 30 minutes without interruption and that he could never climb, stoop, kneel, crouch or crawl, I note that Dr. Durbin's findings are not supported by his own cursory physical examination of Coomer, during which he noted no evidence of discogenic back pain and no evidence of loss of motion of the left hip. (R. at 986, 1636.) Conversely, Dr. Konrad performed a comprehensive physical examination of Coomer's back in February 2002. (R. at 1135-37.) Dr. Konrad found that the examination was unremarkable and that Coomer had no impairment-related physical limitations. (R. at 1137.) Although Coomer has seen multiple physicians on multiple occasions, with the exception of the state agency physicians, none have imposed any physical restrictions. Moreover, of the state agency physicians, four opined that Coomer could perform medium work. (R. at 1261-70, 1514-21.) Thus, the ALJ gave Coomer the benefit of the doubt in finding that he could perform no more than light work. The ALJ's physical residual functional capacity finding is further supported by the various radiological findings contained within the record. X-rays, as outlined above, consistently revealed normal to mild findings.

Therefore, for the foregoing reasons, I find that substantial evidence supports

the ALJ's finding that Coomer could perform the full range of light work.

### III.  Conclusion

For all of the reasons stated above, I find that substantial evidence supports the ALJ's findings, and I recommend that the court deny Coomer's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

An appropriate order will be entered.

DATED:      This 27th day of February 2008.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-33-